### DuPONT v. DuBOS.

1. LACHES—FRAUD.—Delay of fourteen months in bringing action to set aside fraudulent deed, after discovery of fraud, will not defeat the claim, especially when the status of the parties is not changed.

2. FRAUD—REMEDIES.—Where one is induced by a fraudulent deed to convey away a part of his property, and to accept from the beneficiary of the fraudulent deed a conveyance to himself for a portion of it, he is not required to offer to return the property as a condition precedent to bringing action to set aside the fraudulent deed, and to recover that conveyed by him.

3. LIMITATION OF ESTATES—FEE CONDITIONAL.—A devise of a house and lot to A, "and the lawful heirs of her body, and also an equal share in my other lands, negroes, &c.," carries a fee conditional to the "house" and "other lands."

4. FEE CONDITIONAL—PARTITION.—A fee conditional estate may be partitioned among the tenants in common.

5. FORGERY—FRAUD.—DEED adjudged to be a forgery and ordered cancelled.

Before BENET, J., Charleston, June, 1896. Affirmed.

Action by Gilbert Geddes DuPont v. Elizabeth C. S. DuBos, and B. H. Rutledge, as executor of B. Rutledge, deceased. Judgment for plaintiff. Defendant, E. S. C. Du-Bos, appeals.

*Messrs. B. H. Rutledge* and *Theo. G. Barker*, for appellant, cite: *Complaint does not show that plaintiff exercised his option to rescind in proper time:* 45 Vt., 342; 43 Vt., 299; 52 Vt., 383; 93 U. S., 62; 48 N. Y., 200; 9 Hare, 622; 5 DeC., M. & G., 139; 4 Paige, 537; 24 Wend., 74; 3 Seld., 220; 1 Ad. & Ell., 41; 5 R. I., 130; 46 Barb., 467; 32 Vt., 1; 16 Mich., 40; 90 Am. Dec., 555; 80 Am. Dec., 386; 42 Mich., 396; 13 Gray, 607. *Complaint does not show that plaintiff exercised his option to rescind in toto:* Rice Eq., 84; 36 N. Y., 533; 23 Pick., 283; 5 East., 449; 15 Mass., 314; Rich. Eq., 164; 21 S. C., 226; 1 Dana, 421; 3 Am. Dec., 230; 16 *Ib.*, 115; 26 Barb., 170; 32 *Ib.*, 182; 2 Hill (N. Y.), 288; 63 Me., 446; 117 Mass., 479; 7 N. Y., 220; 4 M. & G., 897; 2 Exch. (W., H. & G.), 782; 13 Ill., 610; 5 Hill, 390; 5 Barb., 322; 12 Ill., 336; 27 Miss., 498; 49 Am. Dec., 764; 48 *Ib.*, 279; 57 *Ib.*, 642; 25 Beav., 586; 22 Me., 300; 12 How., 51; 98 Ill., 188; 90 Am. Dec., 555; 80 *Ib.*, 386; 42 Mich., 396. *Complaint does not show that plaintiff has restored property received by him in settlement:* 21 S. C., 226; Rice Eq., 84. *Admitting the fraud alleged, plaintiff has no equity to sustain his complaint:* 2 Atk., 587; 2 Vern., 243; 6 Johnson, 169; 4 Rich. Eq., 333. *Mrs. Milne took an absolute estate under will of Thomas Bannister Seabrook:* 1 DeS., 329; 3 DeS., 288; 1 Hill Eq., 357; 2 Hill Eq., 430; 9 East., 267; 4 Barn. & Cress., 749; 4 M. & S., 58; 26 Beav., 81; 1 McC., 61; 2 Rich. Eq., 136; 2 Strob. Eq., 327; 6 Mo. App., 331; 4 Rawle, 66; Salkeld., 239; 27 S. C., 297; 26 S. C., 465; 6 Rich., 370. *Partition (all parties before*

*Court*) is· conclusive of the rights of property: 5 Strob. L., 76; 18 S. C., 352; 4 Rich. Eq., 160; 6 S. C., 356; 21 S. C., 159; 12 S. C., 151; Rice Eq., 238; 2 McC. Eq., 125. *Incidents of fees conditional:* 1 Hill Eq., 265; McM. Eq., 449; 2 Hill, 245; 17 S.· C., 441, 549; 1 Rich. Eq., 402; 2 Rich. Eq., 136; Bail. Eq., 228; 33 S. C., 302; 31 S. C., 13; McM. Eq., 233; 2 McC., 125; 5 Rich. Eq., 542; 46 S. C., 269. *Equity has power to dispose of contingent interest of unborn persons under certain conditions:* 16 S. C., 170; 3 Rich. Eq., 7; 22 S. C., 423; 2 Rich. Eq., 322; 33 S. C., 302; 2 Hill Ch., 53; 10 S. C., 207; 17 S. C., 44; 19 S. C., 403; 81 N. Y., 619; 33 S. C., 504; 136 U. S., 151. *Plaintiff equitably estopped:* 1 Strob. L., 400; 15 S. C., 232; Rice Eq., 84; 1 S. E. R., 852; 25 Beav., 596; 51 Pa., 483; 130 Mass., 50; 30 S. C., 323; 6 S. C., 489; 10 Rich. Eq., 411; 3 Otto, 326; 28 S. C., 142. *What is the proof of fraud required by the Courts?* 75 Vt., 390; 15 Tex., 219; 5 Hare, 559; 17 Beav., 239; 1 H. L. Cases, 615; 3 Blackf., 267; 18 Me., 231; 37 Me., 124; 100 Mass., 448; 51 N. H., 167; 22 Pa. St., 179; 1 Tex., 326; 2 Doug., 176; 20 N. J. Eq., 463; 33 L. J. Ch., 218; 84 Ill., 533. *Testimony of experts in many cases of little value:* 21 How., 101; L. R. Ch. Div., 415, n.; 43 Pa. St., 17; 97 N. Y., 507; 12 Moore, 148; 48 Mo., 291; 79 Ky., 101; 40 Barb., 137.

*Mr. H. E. Young*, contra, cites: *The devise under the will of Thomas Bannister Seabrook is a fee conditional:* DeS., 17; 1 Hill Ch., 205; Bail. Eq., 49; 2 Hill Ch., 246; McM. Eq., 231, 448; 1 Rich. Eq., 174; 3 Rich. Eq., 277; 5 Rich. Eq., 442; 13 S. C., 119; 14 S. C., 609; 17 S. C., 645; 23 S. C., 232; 31 S. C., 27; 33 S. C., 301; 47 S. C., 294; 48 S. C., 440; 1 Atk., 436; 4 M. & S., 58; 4 Rawl., 68; 13 Gray, 108. *Plaintiff not precluded by proceedings in Geddes v. Milne:* 17 S. C., 40; 41 S. C., 172; 45 S. C., 53, 93; 48 S. C., 458; 32 Atl. Rep., 878; 1 Hill Ch., 276. *Can the fee conditional be destroyed by release?* 1 McM. Eq., 233; 1 Hill Ch., 277; 2 Hill Ch., 247; 4 S. C., 515; 3 Mer., 607; 3 Met., 121; McM.

Eq., 448; 33 S. C., 294. *For partition a fee conditional is always valued as fee simple:* 3 Rich. Eq., 77; 46 S. C., 269. *Comparison of handwriting admitted in doubtful cases:* 5 S. C., 478. *Compromise made by reason of forged deed not binding:* 1 D. G. M. & G., 691; 2 H. L., 281; 7 Ib., 750; 120 Mass., 25; 116 Mass., 154; 102 Mass., 225; 2 Allen, 486; 22 Pick., 48; 11 Wend., 557; 13 Ib., 87; 47 Vt., 137; 61 N. W., 523; 2 Hill Ch., 96, 470; 2 Rich. Eq., 162; 19 S. C., 402. *Statute does not run until fraud is discovered:* 40 S. C., 442. *Equity will relieve against compromise entered into under mistake of law:* 2 J. & W., 205; 2 B. & B., 180; Sevaust, 137; 32 Geo., 181; 8 Wheat., 211; 98 U. S., 91; 2 McM., 463; 1 Hill Ch., 251; 20 S. C., 330; 26 S. C., 41, 61, 450; 32 Atl. R., 566; 45 S. C., 500. *No laches:* Ambler, 645; 3 Brown C. C., 639; 43 S. C., 411; 11 H. L., 714; 37 Atl. R., 261. *Finding of fact by Circuit Judge will not be reviewed unless evidence in "Case:"* 42 S. C., 182, 380; 44 S. C., 386; 47 S. C., 63. *Weight to be attached to finding of fact below:* 46 S. C., 510; 45 S. C., 508; 47 S. C., 352.

April 6, 1898. The opinion of the Court was delivered by

MR. JUSTICE POPE. This action, which was commenced on the          day of June, 1889, was once before this Court on appeal from the order of reference made by Judge Hudson, and on that appeal this Court affirmed the order appealed from, on the ground that the issues raised herein were equitable. 33 S. C., 389. At the reference all parties to the action offered testimony, and it came on to be heard before his Honor, Judge Benet, on the pleadings and testimony.

A demurrer was interposed on the ground that the complaint did not state facts sufficient to constitute a cause of action. This demurrer was overruled. Judge Benet, by his decree, adjudged that the deed which was alleged to be forged was a forgery, and ordered the same to be cancelled, with a direction to defendant, Mrs. DuBos, to deliver possession of a certain tract of land in St. Andrews Parish,

known as "Rose Cottage," to the plaintiff, and ordered a
reference to one of the masters of Charleston County, to
ascertain and report the amount on the mortgage debts held
by the defendant, Rutledge, as executor of the last will of
the late Gen. B. H. Rutledge. From so much of this decree
as affected the defendant, Mrs. DuBos, both as to her de-
murrer and also on the merits, she has appealed on more
than forty grounds. It remains, therefore, for this Court
to pass upon the same.

We will first consider those relating to the demurrer to
the complaint, and this we conceive can be best done by first
reproducing the complaint, which was as follows: "The
plaintiff above named, complaining, &c., alleges: 1. That
Thomas Bannister Seabrook, late of Edisto Island, in the
State of South Carolina, departed this life on the          day
of April, 1839, leaving of force his last will and testament,
which was duly admitted to probate by the court of ordi-
nary for Charleston District (now county), in State afore-
said, on the 2d day of May, A. D. 1839. That of said will
he appointed his daughter, Elizabeth Clark Seabrook, ex-
ecutrix. That the said Elizabeth, after the making of said
will, intermarried with one Andrew Milne, and under the
name of Elizabeth Clark Seabrook Milne qualified as exe-
cutrix of the said will, and undertook the burthen of the
administration thereof. 2. That by the said will the said
testator, Thomas Bannister Seabrook, devised to his said
daughter (who will hereinafter be designated as Mrs. Milne)
certain real estate, among which was the plantation in St.
Andrews Parish and the house and lot in the city of Char-
leston, hereinafter more particularly described in fee condi-
tional at the common law, that is to say: 'to her and the
lawful heirs of her body.'  3. That the said Mrs. Milne
died on the          day of November, 1882, aged ninety-six
years, without ever having had issue at any time. 4. That
upon the death of the said Mrs. Milne, the plaintiff, Gilbert
Geddes DuPont, was the sole heir at law of aforesaid tes-
tator, Thomas Bannister Seabrook, _in esse_, and solely enti-

titled to take, under the limitations of the said will, the said plantation and house and lot.  5. That the said Mrs. Milne, on the 28th day of October, A. D. 1876, executed her last will and testament, and on the 20th day of October, 1880, executed a codicil thereto, wherein and whereby she undertook to dispose of said plantation and house and lot to persons whom she designated in said will and codicil as Elizabeth Clark Seabrook Milne and Martha Bannister, wife of A. C. Whitridge.  That these devisees are and were strangers in blood to the aforesaid Thomas Bannister Seabrook, and, in fact, do not bear the names given to them in the said will, except by courtesy and usage.  That they were not blood relations of the said Mrs. Milne.  On information and belief, the plaintiff states further that they were never adopted by the said Mrs. Milne, but were treated from their early youth as her adopted daughters.  Their real names the plaintiff does not know, and will distinguish them as above.  6. That the said Martha Bannister Whitridge had, prior to the death of Mrs. Milne, intermarried with A. C. Whitridge, of Baltimore, Maryland, and had removed to that city, and shortly after the probate of the will of Mrs. Milne, she, Martha Bannister Whitridge, conveyed her interest in the property devised to her to the said Elizabeth Clark Seabrook Milne.  7. That immediately upon the death of the said Mrs. Milne, the said Elizabeth Clark Seabrook Milne entered upon and took possession of both the said plantation and said house and lot, and shortly thereafter this plaintiff resolved to assert his rights in the premises, and for that purpose, on the 20th day of January, 1883, began proceedings at law against the said Elizabeth Clark Seabrook Milne and Martha Bannister Whitridge, to recover possession of the said house and lot in Charleston. 8. That during the pendency of such proceedings, negotiations were opened between the solicitors of the plaintiff and the defendant herein, for an adjustment of said suit, and during such negotiations, the deed, a copy of which is annexed to this complaint and marked exhibit A, was set up

by the defendant, Elizabeth Clark Seabrook Milne, as a
genuine deed and as a bar to the plaintiff's claim in the
premises. The plaintiff at that time did not doubt the
genuineness of said deed, and influenced and deceived there-
by, compromised said case, and conveyed to the defendant
the aforesaid plantation, the said Elizabeth Clark Seabrook
Milne executing to him a quit claim deed of the said house
and lot. 9. That during the said negotiations, one Louis
DuBos was the agent of and acted for the said Elizabeth
Clark Seabrook Milne, his relations with her being those
of a confidential friend and adviser. Shortly after the said
compromise was effected, and the said plantation conveyed
by this plaintiff to the said Eliz. Clark Seabrook Milne, she
and the said Louis DuBos intermarried. She will hereafter
be known as Mrs. DuBos. 10. That subsequent informa-
tion, obtained some time in the year 1888, and not earlier,
aroused the suspicion of this plaintiff that the said deed was
a forged and false document, and was known to be such by
the said Louis DuBos and Mrs. DuBos at the time it was
used as above stated. He, this plaintiff, immediately began
his investigation on this point, and, after careful investiga-
tion, became convinced, in April, 1888, that the said deed
was a forgery. And on information and belief, this plaintiff
states the deed to be a forged and false deed, and that it
was known by the said Louis DuBos and Mrs. DuBos to
be forged and false, and was then and there falsely and
fraudulently used by them to influence the plaintiff and to
obtain from him a surrender of his rights. That this plain-
tiff was misled by said deed, and, considering it a genuine
and valid deed, was induced to give up a portion of his in-
disputable property to the defendant under the name of a
compromise, without any consideration whatever, and that
the whole transaction was a deceit on the part of the said
Mrs. DuBos and her said agent and confidential friend and
adviser, Louis DuBos, practiced on this plaintiff, and an
imposition upon him. 11. That whether or not the said
deed was forged, and whether or not it was knowingly used

by the defendant to influence the plaintiff and force him to the aforesaid compromise, still the plaintiff avers and says that the said deed acted as a surprise to him; that he mistook his rights in the premises, and without any consideration whatever gave up a large portion of his inheritance, just after it had fallen to him, and when he was a young man with little or no experience in such matters. That by the so-called compromise this plaintiff acquired absolutely nothing, and the said Elizabeth Clark Seabrook Milne (now Mrs. DuBos) parted with no rights and suffered no loss. 12. The aforesaid action of this plaintiff to recover said property from the said Mrs. DuBos was filed on the 20th day of January, 1883, and the interchangeable deeds between the plaintiff and Mrs. DuBos was dated        day of June, 1883. 13. (This paragraph contains a description of the plantation, and is omitted, and, also, the house and lot in Charleston.) 14. (This paragraph alleges that the rents and profits of the plantation are $500 per annum, and is omitted.) Wherefore the plaintiff prays judgment: That the said deed from Gilbert Geddes DuPont to Elizabeth C. S. Milne, of June, 1883, be declared a nullity," &c.

The grounds of demurrer as presented to the compliant, which were passed upon by the Circuit Judge, were as follows: "*First.* Because the complaint fails to state facts showing that plaintiff exercised his option to rescind, or declared his intention, or took steps, to rescind promptly after the discovery of the fraud. On the contrary, the complaint shows that the plaintiff delayed and kept silent for fourteen months before he took any steps to rescind, after the discovery of the alleged fraud. *Second.* The complaint fails to show that plaintiff exercised his option to rescind the contract *in toto*, and to put the parties in the same state as that in which they were before the deed sought to be cancelled was signed, and shows that plaintiff claims to rescind in part only a transaction which was entire, and consisted of two parts mutually dependent. *Third.* The complaint does not show that plaintiff has restored the pro-

perty received by him in settlements, viz: the house and lot in Bull and Rutledge streets, Charleston, conveyed to him by Miss Milne, which conveyance was the consideration for the conveyance or release by him to her of the plantation in St. Andrew's Parish and part of the settlement in 1883; and the complaint does not show that plaintiff has made offer to restore the same, or its value, or that he has accounted for intermediate rents and profits received by him."

As to the first, we can only say, that, in our judgment of the law, the delay by the plaintiff of fourteen months from the time he became satisfied of the fraud alleged to have been practiced upon him by the defendant, Mrs. DuBos, before bringing his action to cancel the alleged fraudulent deed, does not operate so as to defeat plaintiff's action. It must always be remembered that in such cases the law allows a reasonable time in which to bring an action to cancel a deed for fraud, for the purpose of the plaintiff making inquiries and taking advice of counsel. *Erlanger* v. *New Sombraro Co.*, 3 Appeal Cases, 1218. At law, fraud must be taken advantage of within six years of its discovery. Where, however, an equitable action must be brought, by analogy a court of equity will follow the period fixed in law cases by statute. *Peele* v. *Gurney S. R.*, 6 H. L., 384. Of course, if the delay in the preservation of the equitable right has involved the other party, by causing an alteration of the *status* of the parties, which alteration was known to the plaintiff, and he blindly allowed such *status* interfered with, a court of equity would punish such plaintiff for his want of diligence. By the allegations of the complaint now under consideration, there seems to have been no alteration of the *status* of these parties between the accrual of a right of action in April, 1888, when the fraud was discovered, and the 8th day of June, 1889, when the action was brought.

The second ground of demurrer is not tenable. If the allegations of the complaint, so far as the facts thereof are

concerned, are admitted for the time being, when the plaintiff sets out that under the will of his grand-father, at the death of Mrs. Milne, in November, 1882, he became entitled, as the only living heir at law of his said grand-father, to the ownership and possession both of the plantation situated in St. Andrew's Parish and the house and lot on Rutledge and Bull streets, in Charleston; and that the defendant based her right to hold the same as the devisee of Mrs. Milne, to whom the said pieces of real estate had been devised by Thomas Bannister Seabrook, in the words, "to Elizabeth C. Seabrook and the heirs of her body;" and that said Elizabeth died without issue at any time; and that he was induced by the defendant, Mrs. DuBos, by means of a forged deed, which she knew was a forgery, and which the plaintiff was induced to believe was a genuine deed by the said Mrs. DuBos, to make a deed whereby he conveyed the plantation in St. Andrew's Parish to her, and received from her, as a part of the same transaction, a quit claim deed to the house and lot on Rutledge and Bull streets, in Charleston; and that the plaintiff, now having discovered the fraud and forgery of the deed made on 26th June, 1866, and relied upon as the inducement to the interchangeable deeds in 1883, brings his action to cancel the deed he made to Mrs. DuBos, and does not offer to reconvey the house and lot to which she executed a quit claim deed to the plaintiff, why should the plaintiff be required to rescind, or offer to rescind, such defendant's quit claim deed to him as a condition precedent therefor? The allegations of fact in the complaint are, that the plaintiff was seized as of fee of both these pieces of land, and that the defendant had no just claim thereto in the year 1883, when the plaintiff made the deed to the defendant through her presentation of a forged deed as a genuine deed. If these facts are true—and the demurrer, for the purposes thereof, admits them to be as stated, for the time being—what duty does the plaintiff owe her either to rescind or offer to rescind the deed whereby he has come into his

rightful possession? We think not. The recent case of _Fink_ v. _Smith_, 32 Atl. (Pa.), 566, is an apt illustration of this point. Here we have the unquestioned owner bargaining with one for the surrender of his property, and the contract is made. Is it valid? * * * It being such, there was no consideration for Smith's promise, for no benefit passed to Smith, and Fisk sustained no loss by the contract. "To hold that the abandonment of a wholly wrongful detention of another's property can form the basis of a compromise contract with the owner, is the direct encouragement to the commission of wrong for profit; and for this very reason the law holds the contract to be without consideration."

And these views dispose of the third ground of demurrer also. We must sustain the Circuit Judge in overruling the demurrer; but, in doing so, we mean our conclusion to cover only the grounds of the demurrer, and not by any means to control the decision of the interesting questions yet to be considered.

The answer of the defendant must now be regarded as raising the questions as to the merits. The answer of Mrs. DuBos is as follows: "I. That she admits the allegations contained in paragraphs 1, 3, 6, 7, 9, 12, and 13 of the complaint. II. That she denies the allegations contained in paragraphs 2, 4, 10, 11, and 14 of the complaint. III. That as to allegations of the 5th paragraph, defendant admits the same as generally true, but denies that she and her sister were not adopted by Mr. and Mrs. Milne. IV. That as to the 8th paragraph of said complaint, this defendant alleges that at the time the suit referred to in paragraph 7 was pending, a similar suit at law was pending between the same parties in Berkeley County for the recovery of the plantation in St. Andrew's Parish; and, further, a complaint in equity between the same parties was also pending in Charleston County relative to the several transactions, all of which will hereafter be more fully set forth. And she admits that during the pendency of the proceedings aforesaid, negotiations for the adjustment of the various claims in the several

controversies and suits between the plaintiff and defendant
were begun, and the deed in question (now alleged by the
plaintiff to be forged and fraudulent) furnished one among
the many elements of equity submitted by this defendant
as affecting the various transactions which led finally to the
compromise of the several controversies.    But this defend-
ant denies that the said deed was received confidingly and
without doubt as to its genuineness by the plaintiff; and
that the said deed by itself alone was set up as a bar to his
rights, and that the plaintiff was deceived by it; and that
the compromise was made in the suit as to the house and
lot in Bull street, as is stated in said paragraph; and alleges,
'on the contrary, that said compromise was a full and com-
plete settlement of all the controversies then pending be-
tween the parties, and upon said settlement, interchange-
able deeds were delivered between the parties.'   V. And
this defendant, for a further defense, answering, says: That
Thomas B. Seabrook, by his will, dated the 5th of Septem-
ber, A. D. 1827, bequeathed and devised the bulk of his
property, real and personal, to his two surviving daughters—
Caroline, who, during her lifetime intermarried with Gel-
bert C. Geddes, and Elizabeth Clark, who, after his death
intermarried with Andrew Milne—and a legacy of some
$6,000 to his grand-daughter, Elizabeth S. Faber.    That at
the time of his death, on or about May, 1839, his estate con-
sisted of a large amount of property, both real and personal,
the real estate consisting of the following parcels, viz: the
house and lot on the corner of Bull and Rutledge streets,
in the city of Charleston, used by him as a residence, and
after his death by his widow up to the time of her death; a
house and lot on the corner of Rutledge and Montague
streets, in the city of Charleston; and a large lot adjoining
the house and lot on Rutledge and Bull streets, on the south
side; the plantation in St. Andrew's Parish, involved in this
contention, and a plantation on John's Island, and the per-
sonal estate, consisting of negro slaves, bank stocks, &c.
That the house and lot on the corner of Bull and Rutledge

streets, and the house and lot on Rutledge and Montague streets, he devised by identical limitations to his two daughters, respectively, as follows: 'To my beloved daughter, Elizabeth Clark Seabrook (Mrs. Milne), I give and bequeath the house and lot where I reside, at the corner of Bull and Rutledge streets, to her and the lawful heirs of her body, and also an equal share of all my lands, negroes, &c. And to my beloved daughter, Caroline Seabrook (Mrs. Geddes), I give and bequeath the house and lot at the corner of Rutledge and Montague streets, to her and the lawful heirs of her body, and also an equal share of all of my lands, negroes, &c.,' all of which will more fully appear by reference to said will. That after his death, his daughter, Elizabeth Clark Seabrook (Mrs. Milne), proved his said will on the 2d of May, 1839, and qualified as executrix on the 18th day of May, 1839. That shortly afterwards, embarrassments occurred between the parties under the said will, in reference to the legal rights of the parties respectively, and on the 31st of May, 1839, a bill was filed in the Court of Equity for Charleston County, by Gilbert G. Geddes and Caroline Geddes, his wife, plaintiffs, against Elizabeth Clark Milne and Elizabeth S. Faber, defendants, alleging that as to all the property of the estate (independent of the house and lot on the corner of Bull and Rutledge streets, and the house and lot corner of Montague and Rutledge streets, and the special legacies to Miss Faber), the will created a tenancy in common, and the same was divisible in moieties between the sisters exclusively as tenants in common. That answers were duly filed by Mrs. Milne and Miss Faber, the latter claiming that, however this might be ·as to the lands and negroes, it was not true as to the bank stock, &c., which was intestate property, and as to this, she was entitled to one-third thereof. That the cause came to issue, was fully argued, and on the 15th of July, 1839, a decree was made by Dunkin, Ch., by which it was determined that the lands and negroes were divisible equally between the two sisters, Caroline Geddes and Elizabeth C. Milne, as tenants in com-

mon, but that the remaining property was distributable into thirds, of which Miss Faber was entitled to one-third; and ordered a writ of partition to issue for the purpose of dividing both the realty and personalty, 'so as to assign to each her share in severalty.' That in accordance with and in pursuance of this decree, writs of partition were formally issued for that purpose, and duly executed, in which it was recommended that the plantation on John's Island should be assigned to Mrs. Caroline Geddes, and the plantation in St. Andrew's Parish (the one herein involved) to Mrs. Elizabeth C. S. Milne, upon condition of her paying $4,000 for cowelty, all of which was done; and the said returns in partition were confirmed by order of said Court on January 31st, 1840, and the parties respectively went into immediate possession of their several allotments. And Mrs. Geddes took possession of the said John's Island plantation, and subsequently sold it on the 6th February, 1849, for the sum of $5,000; and Mrs. Milne took possession of the plantation in St. Andrew's Parish, and remained in possession up to the time of her death. That in accordance with the recommendations of said writs, the house and lot in front of the Bull street residence was sold and proceeds divided between Mrs. Geddes and Mrs. Milne, and the balance of the said estate distributed in thirds, Miss Faber receiving one-third. That by these proceedings, the rights of all the parties were finally adjudicated and fixed in January, 1840. All of which will more fully appear, reference being had to said judicial record. VI. That by her last will and testament, the last codicil to which bears date the 20th October, 1840, the said Elizabeth C. S. Milne devised the house and lot on the corner of Rutledge and Bull streets, and the plantation in St. Andrew's Parish, to her two adopted daughters, Elizabeth C. S. Seabrook (subsequently Mrs. DuBos) and Martha Bannister Seabrook (Mrs. Whitridge), the latter of whom released all her interest in said plantation to her sister, this defendant. That said devisee took possession, or rather remained in possession, of the said premises; and shortly

afterwards two several actions at law were commenced (the one for the recovery of the plantation in St. Andrew's Parish) in the Court of Common Pleas for Berkeley County, and the other for the recovery of the house and lot on the corner of Bull and Rutledge streets, in Charleston County. That summons and complaint were filed respectively in said suits on the 24th February, 1883, in behalf of Gelbert Geddes DuPont, plaintiff, against Elizabeth Clark Seabrook Milne, and Martha Bannister Seabrook, and notice of pendency of action filed respectively the same day. VII. An answer denying absolutely the rights of said DuPont was filed to the complaint in suit in Charleston County for the house and lot in Bull and Rutledge streets. VIII. On April 7th, 1883, the said E. C. S. Milne filed a complaint in the Court of Common Pleas for Charleston County, equity side, against the said Gelbert C. DuPont, praying injunction of the two suits aforesaid on the various grounds therein stated, and among others on the covenants and agreements of the deed of the 26th June, 1866, now alleged to have been forged and fraudulent; and, so far as the suit in Berkeley County for the said plantation in St. Andrew's Parish, on the additional and independent ground that the said DuPont had not a pretense of title to said plantation, and that his said suit in this respect was vexatious and illusory; to which complaint said DuPont filed an elaborate and detailed answer, in which he denied especially the effect of the said deed now alleged to be forged and fraudulent, and prays strict proof thereof; all of which will fully appear by reference to said proceedings of file in said county. IX. That almost immediately after the institution of said suits at law aforesaid, the expediency of adjusting said differences by compromise was considered; and after full and careful examination, with every opportunity for investigation, those ideas took definite shape and form, and on 19th June, 1883, an agreement was reached between the parties, which was formally executed, and deeds were delivered between them on 24th July, 1883. X. That by reason of the pending

negotiations aforesaid, no answer was filed to the suit in Berkeley County for the St. Andrew's plantation, and the same had not been docketed; and, upon conclusion of the compromise aforesaid, the said suit was abandoned. But the suit for the Bull and Rutledge street house, to which an answer had been filed on      day of March, 1883, was docketed. And on the 11th day of March, 1884, was disposed of finally by the following order, viz: 'It appearing that the defendants in the above action has delivered possession of the property in question to the plaintiff; on motion of J. N. Nathans, plaintiff's attorney, with the consent of Rutledge and Young, for the defendants, it is ordered, that the cause be marked discontinued on the docket, without costs, Kershaw, Judge.' By which said compromise and adjustment the said DuPont received in possession the Bull and Rutledge street house and lot, then valued at $8,000, and which he shortly thereafter sold for $8,000, and this defendant was left in undisputed possession of the plantation in St. Andrew's Parish, valued at the time of the said compromise at $3,000. XI. And the defendant, as a further defense, answering, says: That none of the causes of action stated in the complaint accrued within six years before the commencement of this action. XII. And the defendant, as a further defense, answering, says: That the claim of the plaintiff is a stale claim, and not enforcible in a court of equity."

It is well always, in endeavoring to unravel a tangled and complicated question, to look at its origin. Thomas Bannister Seabrook, by his will, provided a house and lot in the city of Charleston for his daughter, Elizabeth Clark Seabrook, to her and "the lawful heirs of her body." This certainly created a fee conditional; but to this devise he added the words, "and also an equal share of my other lands, negroes, &c." What estate did the testator create in such "other lands and negroes" in Elizabeth? We think it was a fee conditional, also, for these reasons: The conjunction "and" certainly brought

this incomplete sentence into a direct connection with that immediately preceding it, thus evidencing that the testator meant this devise and bequest for his daughter, Elizabeth. This is conceded; but the contention arises as to what effect will be produced upon such incomplete sentence by the word "also" along with the word "and." The primary meaning ascribed by Mr. Webster, in his International Dictionary, to "also" is: "1. *In like manner; likewise.*" In the second volume (new edition) of A. & E. Enc. Law, it is thus stated: "The word 'also' means 'in like manner;' 'further;' 'in addition to;' 'too;' " and as authorities the author cites Webster's Dictionary; followed in *Van Dusen* v. *Fridley*, 6 Dakota, 322; Worcester's Dict.; *Howell* v. *Com.*, 97 Pa. St., 335; *Panton* v. *Taft*, 22 Ill., 367. "The words 'also' or 'and also' are usually used in wills as copulative, carrying on the sense of the preceding words, and being equivalent to 'in like manner.' In this sense, the conditions attaching to the preceding disposition of property attach also to the succeeding, or *vice versa*," and authorities cited in note 1, at page 178. The whole item is in these words: "To my beloved daughter, Elizabeth Clark Seabrook (Mrs. Milne), I give and bequeath the house and lot where I reside, at the corner of Bull and Rutledge streets, to her and the lawful heirs of her body, and also an equal share of all my lands, negroes, &c." The language quoted is the entire "Item" of the will. Now, it seems to us that the copulative "and" connected the words that followed it with the words which preceded it, and that the words, "and also," thus used, denote the intention of the testator that the devise of the house and lot and "other lands," should be considered as governed by "lawful heirs of her body," thus creating a fee conditional in said house and lot and "other lands." The testator used similar language in the item of his will when he gave a house and lot on Rutledge and Montague streets, in the city of Charleston, to his daughter, Mrs. Caroline Geddes, and "the lawful heirs of her body, and also an equal share of my other lands, negroes, &c."

But it is contended by the appellant that under the bill in equity, which was filed by Mrs. Geddes and her husband against Mrs. Elizabeth Clark Seabrook Milne and Miss Faber, as defendants, in March, 1839, the words, "and also an equal share of my other lands, negroes, &c.," were treated by all parties as meaning that Mrs. Geddes and Mrs. Milne took "the other lands and negroes, &c.," in fee simple, pure and simple. It is true, a partition in kind was made under such suit in equity of the "other lands and negroes, &c.," between the said Elizabeth and Caroline in equal shares, yet that is not a fact that militates against our views. Estates in fee conditional were the subject matter of partition under our laws. *Barksdale* v. *Gamage*, 3 Rich. Eq., 271. In the case cited, a partition between two persons in whom lands were vested in fee conditional was recognized. Apart, however, from an authority recognizing the power of partition of lands by two or more persons in fee conditional, the right of partition must exist. The fee conditional was well described by Chancellor Dargan, in *Barksdale* v. *Gamage, supra:* "For a fee conditional is defined to be 'a fee restricted to some particular heirs, exclusive of others; *donatio stricta et coarctata; sicut certis haeridibus, quibusdam a successione exclusis;* as to the heirs of a man's body, by which only his lineal descendants were admitted; or to the heirs male of his body, in exclusion both of collaterals and lineal females, also.' 2 Be Com., 110." Chief Justice McIver, in his well considered opinion in *Selmon* v. *Robertson,* 46 S. C., 262, where he was considering the power of a valid limitation over by way of executory devise after an estate in fee conditional, makes this quotation from the opinion delivered by Chancellor Wardlaw, in *Buist* v. *Dawes,* 4 Rich. Eq., 423: "It has never been doubted, since the introduction of executory devises, that a fee could be limited by executory devise upon a fee simple absolute, where there was no objection on the score of remoteness; and it is difficult to find any reason why the same doctrine should not be applied to a fee simple condi-

tional.   We have seen that both these classes of fees exhaust
the estate, so that no remnant exists for the subject of a re-
mainder; and both equally need the benignant aid of courts
in the interpretation of wills, in giving effect to executory
devises.   If a fee simple conditional be a less estate than a
fee simple absolute, and yet not so reduced as to be a par-
ticular estate of freehold which admits a remainder, there
seems stronger reason why courts should recognize the *jus
disponendi* of testators in creating limitations over upon
this estate.   Littleton says, 'A man cannot have a more
large or greater estate of inheritance than a fee simple.'
And Lord Coke, commenting thereon, says: 'This doth ex-
tend as well to fees simple, conditional, and qualified, as to
fees simple, pure, and absolute.   For our author speaks of
the ampleness and greatness of the estate, and not of the
perdurableness of the same; and he that hath a fee simple,
conditional or qualified, hath as ample and great an estate
as he that hath a fee simple absolute, so as the diversity
appeareth between the quantity and quality of the estate.'
Co. Litt., 18.   The prominent distinction between these
two classes of fees simple is in the description of the heirs
to which the estates respectively descend—one to the heirs
generally, and the other to particular heirs of the body,
generally, or restricted as to sex and as to the body that
shall bear them.   This, of course, effects the duration of
the estate in the donee and the reverter to the donor, but
both are estates in fee simple of the same quantity.   All
the rules applying to estates in fee are equally applicable
to the estate of fee conditional—to its creation and limita-
tion, and the time of its continuance under the limitation,
with the exception of the order of its descent and the right
of alienation to bar the donor.   2 Preston on Estates, 320.
* * * A fee conditional during its continuance is the en-
tire fee simple estate, *Adams* v. *Chaplin*, 1 Hill Ch., 278,
and is as fit a subject for executory devise as a fee absolute."
Does not the devise of land to A and B, and their respective
lawful heirs of body, create a tenancy in common in A

and B in fee conditional, and cannot such tenancy in common be separated by a partition of the land? Certainly it can be done. Under this view of the effect of the particular proceedings in the suit in equity began in 1839 and consummated in 1840 between these sisters, Elizabeth and Caroline, where the Court decreed that Elizabeth should take what was then and now is known as the plantation of land in St. Andrew's Parish, and that Caroline should take the plantation of land on John's Island, each took an equal share of the "other lands" of their father, T. B. Seabrook, to them and the lawful heirs of their respective bodies. It must be observed just here that the decree in equity, pronounced by Ch. Dunkin in July, 1839, did not undertake to do any more than merely to have writs of partition to issue. Indeed, it was mainly directed to ascertain what force could be imputed to the term "&c.," added to the end of the "Items" of the will in favor of Elizabeth and Caroline, so far as the terms in question affected the testator's grand-daughter, Miss Faber.

But we will proceed: In 1860, it seems that Elizabeth Milne allowed her sister, Caroline Geddes, to occupy as a tenant at will the house and lot on King street, which had been purchased by Mrs. Milne with money from her own estate. On 12th July, 1866, Mrs. Elizabeth Milne, by her deed, conveyed the house and lot on King street to her sister, Mrs. Geddes, for life, and after her death to Elizabeth S. A. Geddes, her daughter, for and in consideration of the love and affection she bore to her sister and niece. It must be borne in mind that there is no other consideration set up in the deed or in any manner referred to than that just named. The appellant claims that on the 26th June, 1866, Mrs. Milne, Mrs. Geddes, and Miss Geddes executed a deed whereby Mrs. Milne was to convey the house and lot to Mrs. Geddes and Miss Geddes, and they, in turn, were to covenant and did covenant with her that the house and lot on Bull and Rutledge streets, in the city of Charleston, and also the plantation in St. Andrew's

Parish, should be hers absolutely.   This deed is a very important element in the contention between these parties, and we will insert it in its entirety: "State of South Carolina. Know all men by these presents: that this indenture is made on the 26th day of the month of June, in the year 1866, between Mrs. Caroline Geddes and Miss Elizabeth Sarah Ann Geddes, her daughter, both living in Charleston, South Carolina, of the first part; and Mrs. Elizabeth Clark Seabrook Milne, living also in Charleston, South Carolina, of the second part, to witness that the above parties have stipulated and agreed on the following compromise and covenant: We, the undersigned, Caroline Geddes and Elizabeth Sarah Ann Geddes, of the first part, acting and stipulating in our names, personally, and as the lawful heirs of the late Thomas Bannister Seabrook, our father and grand-father, do declare that we have released, remised, bargained, and forever discharged, and now, by these presents do, for ourselves individually and separately, and for our heirs, executors, and administrators, remise, release, bargain, and forever discharge Mrs. Elizabeth Clark Seabrook Milne, our sister and aunt, of the second part, her heirs, executors, and administrators, of and from all manner of action and actions, suits, covenants, controversies, claims, and demands whatever in law or in equity, which we might ever had, now have, or may have in the future, or which our heirs, executors, or administrators can, shall or may have, for or by reason of any matter, cause or whatsoever, to the day of the date of these presents, upon the brick house and lot situated southwest corner of Rutledge and Bull streets, in Charleston, South Carolina, with all the buildings thereto appertaining; also, upon the plantation or tract of land situated in St. Andrew's Parish, Charleston County, South Carolina, containing about 800 acres, which house and plantation were bequeathed to the said Elizabeth C. S. Milne by the will of her father, Thomas Bannister Seabrook, dated on the 5th of September, 1827, probated on the 2d of May, 1839, which house and plantation we do declare individu-

ally by these presents to transfer, grant, alien, convey, and surrender forever to Mrs. Milne, with all the rights and titles, claims that we might ever had, or could have now, or in the future, upon them in consequence and by virtue of said will. So that Mrs. Milne shall have, from the present day, full right to dispose of and alien them in any way she will please, by sale or sales, or by will in favor of any one she will choose, without any fear of being herself, or the person or persons that she may recognize and appoint as her heir or heirs, disturbed and interfered in any way, in reason or for cause, of the will of her father, T. B. Seabrook, as aforesaid. We, Caroline Geddes and Elizabeth S. A. Geddes, further acknowledge that we have received, each of us, from Mrs. Milne, the sum of $25 in cash, in the presence of the undersigned witnesses, for and in consideration of the above release and discharge, besides the gift of the house, No. 653 King street, Charleston, as stipulated below—the above transaction having for cause and object to compromise and to give up all claims and interest on our part on the Milne real estate. Now, I, Elizabeth Clark Seabrook Milne, of the second part, do declare that in consideration of the release and discharge consented, agreed as above by Mrs. Geddes and Miss Geddes as above, of all rights and claims they could or might have had on my house and plantation, and outside of the $25 that I have just paid to each of them and as a compromise in reference to their pretended claims on the said house and plantation, I have given, granted, aliened, released, and confirmed by these presents, do give, grant, alien, release, and confirm to Caroline and Sarah Ann Geddes, to their heirs and executors, the house and lot No. 653, situated King street, Charleston, with all buildings and appurtenances, which I bought from the estate of T. L. Bulow, on the 14th of June, 1860, and for which I have paid the sum of $7,000, intending then to secure it as a home for Elizabeth Clark Seabrook Milne and Martha Bannister Milne, both my adopted daughters, and which said house Mrs. Geddes and family have occupied free of rent ever since

by consent on my part. I further declare that the present gift of the house, No. 653 King street, Charleston, to Mrs. Geddes and Miss Geddes, my sister and niece, is made by me not only as a consideration of the release of all rights they might have had on my house and plantation as above stated, but also as a full compensation allowed and granted by me to them and by anticipation for the share which they themselves, their heirs, executors, and administrators, might eventually have had or obtained after my death upon the said house and plantation by virtue of my father's will as mentioned above. It is now agreed between Mrs. and Miss Geddes and Mrs. Milne, that in order to avoid any unpleasantness and difficulties in Mrs. Geddes' family, the above compromise and release shall be kept secret, but that in order to enable Mrs. Geddes and Miss Geddes to secure the full possession and exclusive ownership of the house given to them by Mrs. Milne, a deed of transfer and conveyance shall be made in proper shape and form by Mr. William D. Porter, the legal advisor of the parties, in the course of a month from these presents; but until the regular deed of transfer of the said house is signed by Mrs. Milne, the present compromise shall remain in the keeping of Mr. J. Herman Simons, one of the witnesses to these presents, who shall not deliver it to Mrs. Milne until Mrs. and Miss Geddes are satisfied that their title to the house is good. Made and given under our hands and seals as above stated, on the 26th day of the month of June, in the year 1866, in the presence of Mrs. Julia DuPre, Messrs. L. DuBos, and J. Hume Simons. Caroline Geddes, Eliz. S. A. Geddes, Eliz. C. S. Milne, [L. s.]"
On the 26th June, 1866, the following persons answered the description of heirs of T. B. Seabrook: Mrs. Milne, Mrs. Geddes, Mrs. Wilkins (who had been Miss Elizabeth Faber); so that if Mrs. Milne had died on that date, her heirs would have been Mrs. Geddes and Mrs. Wilkins. Mrs. Geddes at that time had two children, Mrs. DuPont (plaintiff's mother) and Elizabeth S. A. Geddes. Mrs. Wilkins, *nee* Faber, was childless. But Mrs. DuPont died in 1874; Elizabeth S. A.

Geddes died on 13th July, 1866; the plaintiff was the only child of Mrs. DuPont; Mrs. Geddes died in April, 1874, leaving a will; Mrs. Milne died testate in 1882, without child or children. It is apparent that when this alleged covenant was made in June, 1866, Miss Geddes was not an heir of T. B. Seabrook, and was only twenty years of age, and died on the 13th July, 1866, having been in a decline with consumption for months. In November, 1882, when Mrs. Milne died, the plaintiff, Gilbert Geddes DuPont, was the only heir of T. B. Seabrook, then living. On February, 1883, he began his actions to recover his house and lot in Charleston, and his plantation in St. Andrew's Parish, known as "Rose Cottage." The defendant, then Miss Milne (now DuBos), denied his title. She filed a bill in equity, setting up the foregoing "Covenant," alleged to have been executed by Mrs. Geddes, his grand-mother, Miss Geddes, his aunt, and Mrs. Milne. We neglected to state that on 12th July, 1866, Miss Milne executed a deed to the house and lot on King street to Mrs. Geddes for life, and remainder over to Miss Geddes, who died on the next day thereafter. After the death of the life tenant in April, 1874, on the application of Wilford DuPont, the husband of Mrs. DuPont, the house and lot on King street was sold for partition. Directly, the plaintiff here received none of the proceeds of the sale, though his father, Wilford, had the Court to order his share paid over to him. We have seen from Mrs. DuBos' answer, and also her complaint in equity, how, by her pleadings, she embarrassed the young man, DuPont, in his efforts to recover the property. He now claims that he was imposed on by the covenant set up by Mrs. DuPont, and thereby induced to surrender to her without consideration the plantation in St. Andrew's Parish. We have already held that the true construction of T. B. Seabrook's will makes the devise to Mrs. Milne a fee conditional. Mrs. DuBos had no right to resist the plaintiff's demand for his property, unless the compromise made in 1883 was valid, and this compromise was not valid if the

deed known as the covenant was a forgery, and presented by Mrs. DuBos as a genuine deed when she knew it was forged. We must now pass upon this deed. That these investigations have been anxiously made by us and for a length of time, we admit, but we have reached a conclusion. It is strange that no one admits or proves directly who wrote the deed known as a covenant. It is in proof that neither Governor Porter nor General Conner, composing Porter & Conner, wrote it; and it is also in proof that no clerk or other employee in their office wrote it. But such lengthy and seemingly important deeds must have some author. Mrs. DuBos claims that she found it amongst the papers belonging to her testatrix, Mrs. Milne, in the year 1883, after DuPont had begun his actions to recover his property, as he conceived, as the sole heir of T. B. Seabrook. Efforts have been made to learn who wrote this "covenant." Mrs. DuBos says she does not know who wrote it, except at one place in her testimony she thinks Mr. Porter wrote it. All the parties to it are dead. No one of them while living ever referred to its existence. There are _three_ witnesses to this deed known as a covenant. All have been dead for many years save one, L. DuBos. Testimony has been offered on each side as to the signatures of the makers and the witnesses also, and such testimony is conflicting, but seems to favor the plaintiff's view as to the forgeries. Some two witnesses appear who claim that L. DuBos admitted that he made the deed; that he wrote it and signed the names to it, placing his name between that of the two other witnesses. D. N. Carvalho, as an expert of large experience in the matter of investigating handwriting, was examined as a witness. By his testimony, it is alleged that the revenue stamp used on the deed known as a covenant had been used before the 26th June, 1866, and really had the date, February, 1866, written on it before the date of 26th June, 1866, was there written; that when he examined a piece of the seal, opposite Miss Elizabeth Geddes' name, he discovered the presence of eosin, which was only first discovered

in Munich, in the year 1874, and was brought to this country a few years later; that the writing in the body of the deed is not written in the scrivener's natural hand, and is evidently a copy from some other paper; that the language employed in the body of the deed shows a want of knowledge of terms there employed; that the signatures to the deed, both as to its makers and its witnesses, are all forged except that of L. .DuBos, and that the said L. DuBos wrote the body of the deed, and the names of its three makers, and two of the witnesses, as well as his own name.   In *Bennett* v. *Mathews*, 5 S. C., 484, it was held that the testimony of an expert was competent testimony in this State, as had before that time been held in *Plunkett* v. *Bowman*, 2 McC., 518, especially in aid of doubtful proof.   Under all this testimony, the Circuit Judge held that the deed was forged, and that the forgery was perpetrated by L. DuBos. Our examination of the testimony leads us to the same painful conclusion—the body of the deed, the signatures of all three makers, and of two of the witnesses, are forgeries. And the Circuit Judge furthermore held that Mrs. DuBos knew the deed was a forgery when she carried it to her attorneys in the year 1883.   Mrs. DuBos, in her testimony, states: "I was in the room when the paper was executed, and there were present Mrs. Geddes, Sarah Ann Geddes, Mr. Hume Simons, Mr. DuBos, Mrs. DuPre, and Mrs. Milne. I saw them sign.   Q. You knew what that deed was when it was made?   A. Yes, I knew what it was—I had an idea what it was, because Mr. Porter told me what it was.   Q. Which Porter?   A. Lawyer Porter.   Q. Did you hear what it was from Lawyer Porter before or after it was signed? A. Before it was signed. Q. How did Mr. Porter come to make this deed?   A. Because I asked him.   Q. Who was the main party in the conference with General Rutledge? A. Myself in some cases, and the Colonel also.   Q. The Colonel took a lively interest in it?   A. Yes, of course." Now, in the light of this testimony, how can any one doubt

that if the deed was a forgery, Mrs. DuBos knew it, and also that she and DuBos were confederates?

This deed, known as the covenant, being a forgery, and being known as such to Mrs. DuBos, and she presenting it to her lawyer, General Rutledge, as a genuine paper, and the plaintiff here being induced to act upon it as a genuine paper, why should he be prevented from having his deed of conveyance cancelled? It is quite true that family settlements are upheld, but only when good faith is observed—never when such family settlements are induced by a forged paper being presented by a party to it as genuine, when such party knew it was forged.

We have thus passed upon the questions underlying this appeal, not in their language or in their order, but as the matter occurs. We fail to find reversible error in the decree of the Circuit Judge.

It is, therefore, the judgment of this Court, that the judgment of the Circuit Court be affirmed.