JOHN H. ROHR, Appellee, v. WAYLAND G. SHAFFER et al., Appellants.

**PRINCIPAL AND AGENT:** The Relation—Evidence—Sufficiency.
1  Evidence reviewed, and held sufficient to establish the relation of principal and agent in a land exchange in which plaintiff alleged that he had been defrauded.

**FRAUD:** Fraudulent .Representations — Evidence. Evidence re-
2  viewed, and held sufficient to show the making by an agent of fraudulent representations in a land exchange, and the adoption and confirmation thereof by the principals.

**FRAUD:** Fraudulent Representations—Rescission—Value of Land.
3  Principle recognized that one defrauded by fraudulent representations as to the particular *kind* of land for which he made exchange, may rescind, and, in a proper case, demand damages, even though the land received was of a value equal to the value placed upon it in the exchange.

**FRAUD:** Actions—Laches. In determining whether plaintiff is
4  chargeable with want of due diligence in instituting his action, *the time during which he had no reasonable grounds to believe he ·had been defrauded,* will not be counted. Again, such question does not depend alone upon ·the fact *that a certain time has elapsed since the cause .of action arose. Held,* the lapse of almost three years after the deeds in a land deal were *delivered,* did not, in view of the distant location of the land, establish laches.

PRINCIPLE APPLIED: Plaintiff, residing in Iowa, traded Iowa land for unimproved and uncultivated land in Manitoba, Canada, on the representation that the Canadian ' land was good, clean prairie land, free of stones, swamp and brush. ' The land was remote and difficult of access. Plaintiff's inquiries, subsequent to closing the deal, elicited no definite information. Nearly two years after the deal was closed, in response to a letter which he caused to be written, he was told by one who lived some distance from the land, and who did not describe it, and who was not in the real estate business, that the land was not in a good farming district, and was not worth to exceed from $12 to $14 per acre, but that, to arrive at its value, if would be necessary to visit it and go over it. Other letters written by plaintiff as to the land were not answered. Less than a year later, he visited the land, and discovered that it was a tamarack swamp. Up to this time,

plaintiff had no reason to question the honesty of his grantors. Plaintiff rescinded at once. *Held*, plaintiff's delay did not bar his action for the fraud.

*Appeal from Chickasaw District Court.*—A. N. HOBSON, Judge.

SATURDAY, DECEMBER 16, 1916.

ACTION in equity to rescind an exchange of lands because of alleged fraud and misrepresentation on part of defendants. There was a decree for plaintiff, and defendants appeal.— *Affirmed.*

*Clary & Condon, R. Feyerbend, F. B. Shaffer* and *M. E. Geiser,* for appellants.

*John E. Lake* and *Smith & O'Connor,* for appellee.

WEAVER, J.—Defendant Brown is a dealer in real estate, doing business at New Hampton, Iowa, and his co-defendants W. G. Shaffer and A. H. Shaffer are bankers and real estate

1. PRINCIPAL AND AGENT: the relation: evidence: sufficiency.

dealers at the same place. At the time of the transaction here in controversy, one Willenborg officed with Brown, and did more or less business as a real estate agent. The exact nature of the business relations between Willenborg and Brown is one of the matters involved in this litigation. In the year 1910, plaintiff, a young farmer residing at or near Grinnell, Iowa, purchased from or through Brown 120 acres of land in Chickasaw County. Part of the purchase price was paid down, and the remainder was represented by a mortgage indebtedness of such amount that plaintiff's equity in the property on the basis of the price paid was $5,600. In February, 1912, plaintiff conveyed the land to Brown and the Shaffers, for the expressed consideration of $15,600. At the same time, and as the actual consideration of such conveyance, Brown and the Shaffers conveyed to plaintiff a half section of

land in the province of Manitoba. The land was part of several thousand acres which defendants had owned in that province for several years. It is the claim of the plaintiff in this action that, to induce him to make such trade or exchange, the defendants, and more especially the defendant Brown, both in person and through the aid or agency of Willenborg, represented to him that said half section (spoken of in the testimony as "the Canada land") was of good quality, capable of immediate cultivation, and was good, clean prairie, free of stones, swamp and brush. Plaintiff avers that he had then never seen the land, and, believing and relying upon such representations, he was induced to make the exchange. He further alleges that he has since learned that the land so conveyed, instead of being as described by the defendants, is what is known in Canada as *muskeg*, a tamarack swamp, a large part of which is covered with water and practically impassable; that the knowledge of its true condition and of the falsity of the representations made to him by defendants did not come to him until he visited Canada in the year 1914; and that, upon ascertaining the facts, he at once served notice upon the defendants, rescinding the exchange, offering to reconvey to them the title which had been transferred to him, and demanding a reconveyance to him of the Iowa land.

In this action, plaintiff seeks to enforce such rescission. He tenders a reconveyance of the Canada land, and asks that defendants be required to reinvest him with the title to the Iowa land, or, upon their failure to do so, that he have judgment for his damages.

The defense made is in substance as follows: That plaintiff employed Willenborg as his agent to sell the Iowa land, at $130 per acre. Having secured the alleged agency, it is the further theory of the defense that Willenborg and defendants entered into an agreement between themselves whereby, if Willenborg could trade or exchange a half section

of defendants' land for plaintiff's Iowa land, defendants would turn the half section in to Willenborg for that purpose, for the consideration of $5,000. Willenborg then went to Grinnell, found plaintiff, and proposed an exchange of the Canada land on even terms for the Iowa land. This negotiation resulted in a very brief and informal writing, prepared by Willenborg and signed by him and plaintiff, as follows:

"This agreement made and entered into this 25 day Jan 1912 by and between C. B. Willenborg of New Hampton Iowa. Party of the first part and John H. Rohr of Grinnell Iowa party of the second part to wit the party of the second have this day sold to the party of the First Part his 120 A 2 miles of Iona Iowa for the sum $15,600 subject to $10,000 mortgage with the party of the part is assume party of the second part agrees to bye of the party of First part the east ½ of Sec 18 R 11 T 11 about 50 Miles east of Winnipeg for the sum of $5,600 the party of the first agrees to lone to the party of the second the sum of $3,000 for 6 for 3 years. The party of second part is to let the party of First no on or before Feb 15-1912 if he wants this lone of $3,000 This dale is to be closed on or before March 1-1912.

"C. B. Willenborg
"John H. Rohr"

With this agreement, Willenborg returned to New Hampton. Brown and the Shaffers executed a conveyance direct to plaintiff, but this was done at the request of Willenborg, who proposed also that he would have plaintiff convey to them the Iowa land to hold until he could find a buyer for it, and thus enable him to pay them the agreed consideration of $5,000 for the Canada land. Willenborg and Brown then went to Grinnell together, where the exchange of title papers was effected. Defendants deny that Willenborg was their agent or representative in the transaction, and aver that

they had no part or interest therein, except as they had
agreed to sell the land to Willenborg to enable him to deal
in his own right with the plaintiff as above mentioned; and
that they neither made any representation to plaintiff con-
cerning the value or quality of the land nor authorized
Willenborg to make any on their behalf.

The evidence as a whole quite clearly established the
fact that the half section of Canada land is low, wet and
swampy, covered to a very material extent with water, and
interspersed with a growth of trees and brush, and incapable
of being made desirable agricultural land except by a system
of ditching and clearing.

I.   It will be seen from the foregoing that the merits of
the controversy turn largely upon the nature of the part
played by Willenborg. Was he acting for the defendants
and in *their* interests; or as an agent of the plaintiff, repre-
senting *his* interests; or was he a principal in making this
exchange, and looking solely after *his own* interests?

It appears that plaintiff, desiring to dispose of his Iowa
land, first went to Brown's office for the purpose of propos-
ing a sale to him. Brown happened to be out of town, but
Willenborg was in the office, where plaintiff then met him
for the first time. Willenborg swears that at that meeting,
plaintiff entered into an agreement with him personally,
giving him the exclusive agency for 60 days to sell the Iowa
land at the list price of $130 per acre. Plaintiff denies that
he then, or at any other time, had an agency agreement with
Willenborg, or authorized him to sell or find a purchaser for
this land. Soon thereafter, according to Willenborg, he told
Brown of having secured the agency from plaintiff, when
Brown at once responded, "We will trade you a half section
of Canada land for it," and followed this by a suggestion,
"You better go down stairs and talk to Mr. Shaffer about
it, too." The witness further quotes Brown or Shaffer as
saying, "We will trade you a half section of Canada land
for $5,000." Willenborg then went to Grinnell, where he

met plaintiff and procured the contract above quoted. Returning to New Hampton, he showed the paper to the defendants, and they renewed their promise to "deliver him the half section for $5,000." Later, when plaintiff notified him of his readiness to carry out the agreement, Willenborg reported to defendants, and thereupon, Brown, with a conveyance of the Canada land duly executed to plaintiff, went with him to Grinnell, where the papers were exchanged. The deed for the Iowa land was made direct to the defendants and delivered to Brown. Defendants admit that, when Willenborg first reported his contract with plaintiff, they, or one of them, also undertook to carry out the stipulation by which a loan of $3,000 was to be made plaintiff, in the event of his calling for it within a stated period. When the deal had been closed at Grinnell, Willenborg and Brown returned to New Hampton, and within a few days defendants paid Willenborg $500 for what they call his "equity" in the Iowa land, since when he has claimed no interest therein. A little later, defendants sold the land to a third person not a party to this controversy.

Even if plaintiff's case was without support other than the undisputed facts and admissions already recited, we should be disposed to hold the trial court fully justified in

2. FRAUD: fraudulent representations: evidence.

its conclusion that Willenborg was simply the convenient instrument made use of by defendants to accomplish a trade or exchange in which, for reasons of their own, they preferred to remain, so far as practicable, in the background. It is not material that such reasons may have been entirely legitimate; for, without regard to the quality of their motives, the first material inquiry is whether Willenborg was in fact their agent, and, if so, then comes the further inquiry whether he or they, or either of them, materially misrepresented the quality or value of the Canada land, whereby plaintiff was misled or deceived to his injury. We

shall not attempt any complete *résumé* of the testimony bearing upon this issue. The dispute between the parties and their supporting witnesses is in most respects sharp and irreconcilable, and the problem which it presents is one of the preponderance of evidence and the degree of credibility to be accorded to their respective stories of the transaction. Stated briefly, plaintiff testifies that, upon Willenborg's first visit to Grinnell, he made no claim to be the owner of the land and proposed no exchange on his personal account, but said he was representing Brown, and described the Canada property as good prairie land, ready for the plow as soon as the frost was out of the ground, free from swamp, stones and brush. Plaintiff further says that, when asked why the written memorandum made by him did not mention the names of his principals, Willenborg responded that the memorandum amounted to nothing, and he would have the defendants execute a written contract, which he would bring or send to the plaintiff. On the second occasion, when Willenborg and Brown both came to Grinnell, they met at the office of one Mullen, who acted as scrivener in preparing plaintiff's deed to the defendants. Before the deal was closed, Mullen and plaintiff retired to an inner office, where Mullen reminded plaintiff of the risk in buying land at a distance and without inspection, and of the advisability of knowing more about it before parting with the Iowa land. Returning to the main office where the rest of the party was waiting, plaintiff at once renewed his inquiry as to the quality and character of the land, talking with both Willenborg and Brown. As witnesses, the plaintiff and Mullen and Mullen's wife, who was employed in the office, unite in saying that both Willenborg and Brown reaffirmed the representations in substantially the same terms in which plaintiff says they were made to him by Willenborg on his first visit. Plaintiff, addressing himself directly to Brown, asked him if he would "stand behind" the statements by Willenborg, and

Brown answered in the affirmative. He said, however, that he had not himself seen the land, but that his partner had, and that it was such as had been described. He assured plaintiff that he dealt only in good lands, and that they had not come down to Grinnell to beat plaintiff, and if the land did not prove to be all right, he would make it right. Thereupon, the title papers were exchanged. Willenborg and Brown deny making these alleged representations or promises. They admit that, before the papers were delivered, plaintiff and Mullen retired for a time to another room, and that, upon their return to the main office, plaintiff began making inquiries about the Canada land; but they swear that, in reply to his questions, they disclaimed any knowledge of the land or of its character. Indeed, Brown says he told plaintiff, ''I have never seen the land and know nothing about it whatever, and you know just as much about it as I do.'' In all other material respects, both Willenborg and Brown deny the truth of the testimony of plaintiff, Mullen and Mrs. Mullen, in its entirety. It is conceded, however, that, very soon after Mullen and plaintiff had come from the inner office, and plaintiff had made his inquiry concerning the land, the papers were exchanged and the business was closed.

Upon this issue of veracity, we find the preponderance of evidence to be with the plaintiff. That Brown and Willenborg had come to Grinnell for the express purpose of effecting the deal, only to express absolute ignorance of the character of the land they were tendering in exchange for property of the conceded value of more than $5,000, imposes only little less strain upon human credulity than that plaintiff, seeking an assurance of the quality of the land before making the exchange of the title papers, should have at once accepted their utter disclaimer of knowledge on that subject as a sufficient solution of his doubts. Such things may happen, but they are so infrequent that an allegation of that kind will hardly command the credence of the average man

acquainted with the ways of buyers, sellers and traders in general, except upon very persuasive evidence. On neither side is the record of evidence entirely clear of inconsistencies, but, when all due allowance is made on account of the self-interest of most of the witnesses, and due weight is given to all the conceded or well proven circumstances, we are well satisfied that plaintiff has established his claim that Willenborg was the agent of the defendants; that Willenborg represented the character and quality of the Canada land substantially as charged in the pleadings; that such representations were adopted and confirmed by Brown for the defendants; that such representations were untrue in a material degree; and that plaintiff, believing and relying thereon, was induced to part with his land.

It should be said in this connection that it is the defendants' claim that the land was not worthless, but was in fact worth nearly or quite the value placed upon it in the exchange made with plaintiff. But giving the evidence in this regard the most favorable interpretation for the defendants, it is very satisfactorily shown that the land was not such as it was represented to be. It was not clean prairie, it was not susceptible of cultivation, though possibly it might become such after clearing and draining. In short, it was not the kind or quality of land for which plaintiff had bargained, and it was his right, upon discovery of the truth, to rescind the deal.

3. FRAUD: fraudulent representations: rescission: value of land.

II. Appellants make the further point that, in any event, plaintiff has not acted with reasonable diligence, and should be held, as a matter of law, to have waived his right to a rescission because of unreasonable delay in declaring the same. It is also argued that such delay amounts to laches sufficient to work an estoppel upon his claim for equitable relief.

The proposition thus asserted presents the only really debatable question in the case. The transaction was consum-

mated by an exchange of title papers in February, 1912, and

4. Fraud: actions: laches. the written notice of rescission was not served until November, 1914. Under all ordinary circumstances, the courts would have no hesitation in holding that a rescission not declared until more than two years after the alleged false representations was not made within a reasonable time. But it cannot be said, as a matter of law, that a lapse of such a period between the transaction and the declaration of rescission is, in every case and under all circumstances, unreasonable. To charge the complaining party with delay or laches in asking relief on the ground of fraud, it must appear that, with knowledge of such fraud, or of such facts as would naturally suggest it, and cause a person of ordinary prudence to investigate and ascertain the truth, he has failed to invoke the aid of the courts with promptness. In applying this rule, it not infrequently happens that the right of rescission is upheld after months and even years have intervened between the alleged wrong and the institution of legal proceedings. For example, we have permitted or sustained a rescission of an exchange of lands five years after the contract was consummated. See *Campbell v. Spears,* 120 Iowa 670. To the same effect is *Clapp v. Greenlee,* 100 Iowa 586. Whether a rescission is made with reasonable promptness does not depend alone upon the lapse of time, but upon the circumstances of each particular case. *Beardsley v. Clem,* 137 Cal. 328; *Du Pont v. Du Bos,* 52 S. C. 244; *Lewis v. McGrath,* 191 Ill. 401. The rule is sometimes loosely stated in such general terms as to convey the thought that a party to a contract or business transaction must be diligent to discover whether he has been imposed upon by fraud, and that, failing so to act, he waives his right to rescind; but such is not the law. A party dealing with another in good faith has the right, under all ordinary circumstances, to assume that the other party has dealt with him in like good faith, until he discovers that he has been made the victim of fraud, or until he has knowledge or

notice of facts which should induce him, as a man of ordinary prudence, to make an investigation which would lead to such discovery. One engaged in business transactions is not bound to look with suspicion on every person with whom he deals, or to make the conduct of such person the subject of constant inspection or searching inquiry to discover some possible fraud concealed therein; and not until one knows that he has been deceived in this respect, or has credible information which ought in reason to excite in his mind a well-grounded suspicion that he has been overreached, is he charged with the duty of diligent action. See the cases already cited; also *Brown v. Post*, 1 Hun 303; same case affirmed in 62 N. Y. 651; *Baker v. Lever*, 67 N. Y. 304. The cases cited by appellant (*State Bank v. Brown*, 142 Iowa 190; *Moore v. Howe*, 115 Iowa 62; *Tidgwell v. Bouma*, 176 Iowa 47; and others of that class) are all in harmony with our holding in this respect. In the case before us, the land conveyed to plaintiff was many hundreds of miles distant, and in a foreign country. Plaintiff could get personal knowledge of its character only by a long journey and at very considerable expense. So far as appears, there was no immediate occasion for making the trip, and, as we have said, in the absence of anything to inform him, or to direct his attention to the fact that the land had been misrepresented to him, he could rightfully continue to rely upon the representations by which he was induced to make the exchange. He did not go to Canada until the year 1914, when he claims to have first discovered the alleged fraud, and within the following month he notified defendants of his election to rescind, and in December of that year instituted this action. This makes a much stronger showing of promptness and diligence than was made by the plaintiff in *Campbell v. Spears*, supra, where we upheld the right to rescind. The land traded to plaintiff in that case was in South Dakota. The defect in the title of which he complained was shown by the abstract delivered to him and held by him for several years. Even after the defect was fully revealed to him, he

waited from December until the following September before bringing suit; yet we held that, taking into consideration the character of the information he had received, the distance of the land, the investigation necessary, and the fact that situation of the parties continued unchanged, it could not be said that plaintiff did not act with sufficient diligence. Here, the land was much farther away. It was not under cultivation, or in actual possession by the plaintiff or by tenant. It appears to have been isolated and difficult of access. He had made several inquiries concerning it, without eliciting any information, except of a vague and uncertain character; and not until he made a personal visit did he obtain any knowledge justifying him in rescinding the deal, and then he acted immediately. It appears that, in December, 1913, the witness Mullen wrote to a person at Winnipeg, whose address he had obtained from some source, asking him concerning the quality and value of this land. In answer, the correspondent said he was not in the real estate business, and that, to get at the value of the land, one would have to visit it and go over it. He said that the land was not situated in a good farming district, nor was the land east of Winnipeg generally as good as that to the west, and that $12 to $14 per acre would be full value for it. He did not attempt to describe the land, the character of its surface, or whether it was stony or brushy or wet or dry. Other letters to other parties at Winnipeg written about the same time appear to have brought no response. Within less than a year from this time, plaintiff made the trip himself, and took measures to rescind. We cannot agree with appellant that, if plaintiff was defrauded as he claims to have been, the letter received by Mullen was sufficient to excite suspicion, and that he should have then declared his rescission. The letter was entirely too indefinite for that purpose; and, even if we should hold it sufficient to put plaintiff on his inquiry, he was entitled to reasonable time thereafter to make his investigations, and determine for himself whether he had

been deceived. His visit and personal examination of the land were made within the next few months, and we think it should mark the date when he acquired the knowledge which cast upon him the duty of electing the remedy he proposed to pursue. It has been well said by the Michigan court that:

"The law does not require action to rescind before the defrauded person is reasonably certain that he has been defrauded. If he acts with reasonable promptness thereafter, it is sufficient. The law of laches should be used as a shield and not a sword." *Barron v. Myers* (Mich.), 109 N. W. 862, 863.

If this view be correct, the suit was brought in proper time, and the plea of laches and waiver constitutes no defense under the record made. Appellants in argument insist that other information was acquired by plaintiff in the summer of 1912, but we think the record does not show the fact, nor show the alleged information so acquired.

The fact that defendants have sold the Iowa land makes no such change in the situation of the parties as will bar plaintiff's right to relief. While they have not the land to reconvey in kind, they must be presumed to have received its value in consideration paid therefor by the purchaser, and there is no pretense that they did not receive and now have as proceeds of such sale the full value of the equity plaintiff conveyed to them—$5,600.

The judgment of the trial court, that defendants pay plaintiff that sum with accrued interest, as well as the further amount of taxes paid by plaintiff on the Canada land, is correct, and must be—*Affirmed*.

EVANS, C. J., DEEMER and PRESTON, JJ., concur.