Wm. LANZ and Nora J. Lanz, Plaintiffs and
Respondents,

v.

Martin T. NADDY, a single man, personally,
and Martin T. Naddy, doing business un-
der the fictitious firm name and style of
Ohio Oil Syndicate, Defendant and Ap-
pellant.

No. 7611.

Supreme Court of North Dakota.

May 1, 1957.

W. J. Austin, Bismarck, and John O. Garaas, Watford City, for plaintiffs and respondents.

MORRIS, Judge.

This is an appeal from a judgment of the District Court of McKenzie County determining that an oil and gas lease was procured from the plaintiffs by the defendant by fraud and decreeing that the lease is null and void and that it be canceled of record.

The lease in question is dated April 21, 1950, between Wm. Lanz and Nora J. Lanz, as lessors, and Martin T. Naddy, as lessee. It recites a consideration of one dollar and describes certain lands in McKenzie County containing 320 acres, more or less. The term is ten years from the date of the lease or as long thereafter as oil or gas or either of them is produced.

The particular clauses in controversy are these: The lessee agrees

"To pay the lessor One Hundred and Fifty (150.00) Dollars, each year *or ⅛ of gas at the well* in advance, for the gas from each well where gas only is found, * * *.

"Unless operations for the drilling of a test well be commenced and prosecuted with due diligence upon the above described land or within a radius of *10* miles therefrom on or before the *25th* day of *September, 1953,* this shall terminate as to both parties, unless the lessee on or before the date shall pay or tender to the lessor, or to the lessor's credit in the *American State* Bank at *Williston, N. D.* or its successors, which shall continue as the depository regardless of changes in the ownership of said land, the sum of *10¢ per acre per year * * *.*"

It is also provided that:

"If no well be commenced on said land within twelve months after the

Rausch & Chapman, Bismarck, for defendant and appellant.

completion or abandonment of said test well hereinafter mentioned, this lease shall terminate as to both parties, unless the lessee on or before the date shall pay or tender to the lessor, or to lessor's credit in the *American State* (Bank), at *Williston, N. D.* or its successors, which shall continue as the depository regardless of changes in the ownership of said land, the sum of *10¢ per acre per year* Dollars, which shall operate as a rental and cover the privilege of deferring the commencement of a well for *18* months from said date."

The first italicization is interlined in ink and the other italicizations are entered in ink in lined blanks contained in the printed form. The lease was signed at the plaintiffs' farm and later the same day was acknowledged before a notary public in the neighboring town of Alexander.

The specifications of fraud pleaded in the complaint are that the defendant at the time of procuring the execution of the lease falsely represented to the plaintiffs that he would make immediate payment of ten cents per acre as consideration for signing the lease; that he further stated that he would pay the plaintiffs the sum of ten cents per acre per year as delay rental but contrary to this agreement he left a blank in the lease form for the date upon which the delayed payments were to start and later fraudulently inserted therein the year 1953 without the consent, authority, or knowledge of the plaintiffs. It is further alleged that at the time of the execution of the lease the defendant fraudulently represented that he would commence the drilling of an oil well on the premises within three months after the execution of the lease and that unless he did so he would cancel the lease, and that no well was ever drilled nor was the lease canceled. It is also alleged that the defendant falsely stated that the form of the lease was a standard form generally used by the oil industry.

As a second cause of action the plaintiffs allege that the defendant fraudulently and without the knowledge, consent, approval, or authority of the plaintiffs altered the lease by inserting therein the statement above italicized with the exception of the name and address of the depository.

According to Mr. Lanz' testimony the lease was signed at his home. His wife and Mr. Naddy were present. He had never met Naddy before. Naddy said he was doing business for the "Billings Oil Company" and was interested in leasing land for ten cents an acre. Naddy "wrote up" the lease and the plaintiff and his wife signed it. All three of the parties then drove into Alexander where the acknowledgment was completed before a notary public. Naddy took the lease with him but promised to give Lanz a copy. No copy was ever furnished and he never saw the lease again or became aware of its contents until after it was recorded over a year later.

There is direct conflict in the testimony as to what was in the lease at the time it was signed, as well as what the actual agreement was between the parties before the lease was signed. Lanz says that the only parts of the blank that had been filled out at the time of signing were the date, the description of the land, and the name of the depository. The other data in the blank spaces had not yet been filled in. Lanz testified that there was no talk with Naddy about deferring the commencement of a well for eighteen months nor was there any reference made to gas that might be recovered or to drilling a test well within ten miles of the premises and there was no talk about filling in blanks after the lease was signed. The words "10¢ per acre per year" might have been in the lease at the time it was signed. According to Lanz he was to receive ten cents per acre as soon as the title had been checked. This appears to have been in the nature of a bonus. If a well was not drilled on the premises within a year he was to receive ten cents per acre

per year until the well was drilled. Lanz signed the lease and handed it to Naddy. He did not read it but relied upon Naddy to fill it out in accordance with the agreement arrived at during negotiations. Mrs. Lanz testified and corroborated her husband's testimony in all major particulars.

According to testimony of the defendant he obtained sixteen or seventeen leases in McKenzie County during a period of about ten days that included the week of April 13, 1950. The procedure used in obtaining these leases was the same and he made the same statements of fact to each of the lessors. He doesn't remember the details surrounding the signing of the Lanz lease. He thinks it was signed in the store operated by the notary public who took the acknowledgment. However, the notary testifies that the lease had already been signed when Naddy brought it in to be acknowledged. Naddy does not remember anything about the execution, the discussion, or the signing with reference to the Lanz lease. Most of the seventeen leases were filled out in the homes of the lessors. The blanks were filled in at that time and they all provided for the deferment of rental payments until September 25, 1953.

In addition to the plaintiffs three other lessors testified as to the procedure and the agreement that preceded or accompanied the signing of their leases with Naddy. Their testimony in this respect is similar to that of the plaintiffs in this action in all major particulars. The preponderance of the evidence supports the version of the transaction given by the plaintiffs. It now becomes necessary to determine its legal effect.

The lease is on a printed form in which the defendant's name is printed as party of the second part. In the upper left hand corner appears "88 Standard Oil and Gas Lease." It is a form that the defendant obtained and had printed in Montana known as "Montana 88". It is established that the lease was not a standard or the usual form in use in North Dakota at the time it was signed and that there is no requirement in the North Dakota law that oil and gas leases be of certain form or in certain wordage.

■ This is a proceeding in equity to rescind and cancel an oil and gas lease for fraud claimed to have been perpetrated on the lessors by which they were induced to execute the lease. The specific relief of rescission of a written contract may be adjudged if the consent of the party rescinding was obtained through fraud. Section 32–0421 and Section 9–0902, NDRC 1943.

"Fraud in equity includes all willful or intentional acts, omissions, and concealments which involve a breach of either legal or equitable duty, trust, or confidence, and are injurious to another, or by which an undue or unconscientious advantage over another is obtained." Pomeroy's Equity Jurisprudence, Fifth Edition, Section 873.

Section 9–0308, NDRC 1943, provides that:

"Actual fraud within the meaning of this title consists in any of the following acts committed by a party to the contract, or with his connivance, with intent to deceive another party thereto or to induce him to enter into the contract:

"1. The suggestion as a fact of that which is not true by one who does not believe it to be true;

"2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though he believes it to be true;

"3. The suppression of that which is true by one having knowledge or belief of the fact;

"4. A promise made without any intention of performing it; or

"5. Any other act fitted to deceive."

The preponderance of the evidence shows that the lease agreed upon between

Naddy and the plaintiffs was to provide for a ten cent per acre bonus payable as soon as the title was checked and a delay rental of ten cents per acre per year, while the lease as actually written provided for no bonus payments and no delay rental was payable until September 25, 1953, over three years after the date of the lease, and this rental was not payable even then if the lessee commenced drilling a test well within ten miles of the leased land. The preponderance of the evidence also shows that the latter provision was never agreed upon between the parties. There also appears in the lease a somewhat conflicting provision to which the lessors never agreed whereby if no well was commenced on the land within twelve months after the completion or abandonment of the test well the lease would terminate unless the lessee paid or deposited to the lessors' credit ten cents per acre per year which would operate to defer the commencement of a well on the premises for eighteen months. It also appears that Naddy promised to give the lessors a copy of the lease which was never done. He took the lease with him and it was not recorded until April 28, 1951. It is clearly established that the lease as recorded is materially different from that upon which the parties agreed.

The evidence is not clear to what extent the blanks in the lease had been filled in at the time it was signed. The testimony is conflicting on this point. Naddy says that it was his practice in taking these leases to fill in the blanks before the lease was signed. On the other hand, the plaintiffs and three other lessors who testified assert that material portions of the lease were written into the blanks at some later time and that they did not authorize Naddy to fill in blanks in the form in which they now appear. It is certain, however, that Naddy did fill in the blanks either before or after the lease was signed and that they were not filled in in accordance with the agreement.

■ The defendant argues that fraud cannot be predicated upon a promise or a representation that something will be done in the future and that even if Naddy agreed that the lease should contain provisions as plaintiffs contend his failure to comply with the agreement may be a breach of that agreement but being a promise to do something in the future it cannot be considered fraud. It is true that a statement of intention merely cannot amount to a present misrepresentation but only a promise to do something in the future. Pomeroy's Equity Jurisprudence, Fifth Edition, Section 877c; 23 Am.Jur., Fraud and Deceit, Section 38; 37 C.J.S. Fraud § 11.

■ But under our statute "A promise made without any intention of performing it" if made with the intent to induce another party to enter into a contract is actual fraud. Section 9–0308, NDRC 1943. This statutory provision is in accord with the general rule that prevails in the absence of statute. Restatement of the Law of Contracts, Volume II, Section 473; Pomeroy's Equity Jurisprudence, Fifth Edition, Section 877d; 23 Am.Jur., Fraud and Deceit, Section 41; Williston on Contracts, Revised Edition, Section 1496.

In Foster v. Dwire, 51 N.D. 581, 199 N. W. 1017, 1021, 51 A.L.R. 21, this court said:

"When a promise is made, the promisor, by necessary implication, asserts a present and bona fide intention to perform; if, however, notwithstanding such implied assertion of a fact the intention to perform be not present, there is a misrepresentation of a fact upon which fraud may be predicated. The real gist of the fraud in such a case is not the breach of the agreement to perform, but the fraudulent intent of the promisor, and the false representation of an existing intention to perform, where such intent is in fact nonexistent."

■ According to the defendant's testimony he used the same procedure and made the same representations to lessors in procuring some seventeen leases within

the space of ten days. To that extent his testimony agrees with that of the plaintiffs' witnesses. The execution of this lease was not an isolated instance but one of a series of acts on the part of the defendant conforming to a general pattern. The written leases to which he obtained lessors' signatures were not in conformity to the actual agreement he made with the lessors. He promised the lessors copies which he did not furnish. The leases were not recorded until more than a year after their execution. He represented to the lessors that the leases were made out on standard forms when there were no such forms in use in North Dakota at that time and no such forms provided by law. The form of the lease constituted a present representation and not a promise. Whether he knew that the lease was not of a standard form and that no such form existed at the time he made the representation is immaterial. It was a representation which in part at least induced plaintiffs, who were wholly inexperienced with respect to oil leases, to execute the instrument. They relied on him to prepare or fill out the lease in accordance with the agreement and understanding of the parties. The trial court concluded that the lease in question was procured by fraud. We agree with that conclusion.

A person who has been induced by fraudulent representations to enter into a contract has two legal remedies open to him. He may rescind the contract or he may retain what he has received under the contract and bring an action for damages for injuries sustained by reason of the fraud. Federal Land Bank of St. Paul v. Koslofsky, 67 N.D. 322, 271 N.W. 907.

It is asserted that in failing to read the lease the plaintiffs were guilty of negligence and are . thereby precluded from questioning the contents of the instrument that they signed. This proposition, of course, assumes that the blank spaces in the lease were filled out, as the defendant contends, before it was signed by the plaintiffs. We have already reached the conclusion that the signatures of the plaintiffs were obtained by the fraudulent representations of the defendant. Authority is divided on the question of whether one who signs a paper without reading it is so far concluded that he cannot set up that his signature was induced by a fraudulent representation as to its contents. 23 Am.Jur., Fraud and Deceit, Section 171; Bixler v. Wright, 116 Me. 133, 100 A. 467, L.R.A.1917F, 633. We believe that where fraud is clearly shown which has resulted in injury to a party through the execution of a written instrument the failure of the party defrauded to read the instrument before he signs it, especially where the circumstances are such that the defrauded party has reason to rely upon the representations made to him, will not preclude him from asserting the fraud.

In Federal Land Bank of Omaha v. Houck, 68 S.D. 449, 4 N.W.2d 213, 217, the Supreme Court of South Dakota said:

"As between the alternatives of lending use of the courts as a shield to the careless victim or as an instrument to aid the perpetrator of fraud in gathering the fruits of his perfidy, we have little difficulty in making a choice. Where the issue is between the original parties we think neither reason nor policy justifies the reception of a showing of negligence on the part of him who is overreached, as a countervailent or neutralizer of fraud. We therefore adhere to the views expressed in Herreid v. Chicago, M. & St. P. Railway Co., supra [38 S.D. 68, 159 N.W. 1064]."

Davis v. Burkholder, Tex.Civ.App., 218 S.W. 1101, 1104, was an action to cancel an oil lease. The lessors had been induced by false representations of the defendant and a notary who took the acknowledgment of their signatures to sign a different lease from that which they intended to sign. The lessors did not read the lease but relied on the lessee's representations as to its contents and on certain statements made by

the notary public as to what it contained. In upholding the decree of the lower court canceling the lease the court of appeals said:

"The appellees allege and prove they relied upon the honor and integrity of Davis and the notary, and did not read the instrument because of such confidence, and that such parties made false representations, which were in accordance with the verbal agreement, and by such representations induced them to execute the lease. It is established, we think, that a party ought not to profit by his own fraudulent representations or obtain relief from its consequences because the one deceived could have learned of the fraud if he had been diligent. It has been frequently said, if the representations were of such character as to induce the complaining party to rely on them, and he believed them to be true, this would be sufficient for relief, though he may by investigation have discovered the truth."

In this case the failure of the plaintiffs to read the lease does not prevent them from obtaining cancelation of the instrument on the ground of fraud.

■■■ One who is induced by fraudulent representations to enter into a contract may rescind the contract upon discovery of the fraud. Raasch v. Goulet, 57 N.D. 674, 223 N.W. 808; Kramer v. K. O. Lee & Son Co., 61 N.D. 28, 237 N.W. 166; Schaff v. Kennelly, N.D., 61 N.W.2d 538.

It is a statutory rule that one seeking to rescind a contract

"must rescind promptly upon discovering the facts which entitle him to rescind, if he is free from duress, menace, undue influence, or disability and is aware of his right to rescind; * *." Section 9–0904 NDRC 1943; Fekjar v. Iowa State Live Stock Insurance Co., 44 N.D. 389, 177 N.W. 455.

Long delay tends to prove ratification. Westerland v. First National Bank, 38 N.D. 24, 164 N.W. 323, 7 A.L.R. 562.

The defendant points out that the oil and gas lease which is sought to be canceled in this action was executed April 21, 1950, and that the summons in the action is dated November 19, 1951, and argues that the delay in starting the action being a year and seven months operates as a waiver or estoppel of the plaintiffs' right to rescind. The rule of prompt rescission however is subject to the qualification that it does not operate where legal excuse or justification for the delay is shown. Annis v. Burnham, 15 N.D. 577, 108 N.W. 549; Bauer v. National Union Fire Insurance Co., 51 N.D. 1, 198 N.W. 546; Fedorenko v. Rudman, N. D., 71 N.W.2d 332.

In Rohr v. Shaffer, 178 Iowa 943, 160 N W. 279, 282, it is said:

"To charge the complaining party with delay or laches in asking relief on the ground of fraud it must appear that with knowledge of such fraud or of such facts as would naturally suggest it and cause a person of ordinary prudence to investigate and ascertain the truth he has failed to invoke the aid of the courts with promptness. In applying this rule it not infrequently happens that the right of rescission is upheld after months and even years have intervened between the alleged wrong and the institution of legal proceedings. For example, we have permitted or sustained a rescission of an exchange of lands five years after the contract was consummated. See Campbell v. Spears, 120 Iowa 670, 94 N.W. 1126. To the same effect is Clapp v. Greenlee, 100 Iowa 586, 69 N.W. 1049. Whether a rescission is made with reasonable promptness does not depend alone upon the lapse of time, but upon the circumstances of each particular case. Beardsley v. Clem, 137 Cal. 328, 70 P. 175; Du Pont v. Du Bos, 52 S.C.

244, 29 S.E. 665; Lewis v. McGrath, 191 Ill. 401, 61 N.E. 135. The rule is sometimes loosely stated in such general terms as to convey the thought that a party to a contract or business transaction must be diligent to discover whether he has been imposed upon by fraud, and that failing so to act he waives his right to rescind, but such is not the law. A party dealing with another in good faith has the right under all ordinary circumstances to assume that the other party has dealt with him in like good faith until he discovers that he has been made the victim of fraud or until he has knowledge or notice of facts which should induce him as a man of ordinary prudence to make an investigation which would lead to such discovery. One engaged in business transactions is not bound to look with suspicion on every person with whom he deals or to make such person the subject of constant inspection or searching inquiry to discover some possible fraud concealed therein, and not until one knows that he has been deceived in this respect or has credible information which ought in reason to excite in his mind a well-grounded suspicion that he has been overreached is he charged with the duty of diligent action."

The record in this case shows that the defendant left the state within a few days after the lease was signed. The plaintiffs did not know his whereabouts. The defendant was a single man who apparently had no permanent place of business or abode. Service of summons upon him was finally obtained in Dawson County, Montana, on February 5, 1952. When the defendant left North Dakota after the lease was signed he took it with him. He never furnished the plaintiffs a copy as he agreed to do. He did not cause it to be recorded in the office of the register of deeds until April 28, 1951, over a year after it was signed and the plaintiffs did not learn of the contents of the lease and the defendant's fraud in filling it out until after the lease had been recorded. In the light of these circumstances plaintiffs' delay in bringing the action to rescind did not result in a waiver of their right of rescission which resulted from defendant's fraud.

It appears that in October 1951 the plaintiffs executed an oil and gas lease on the property herein involved to one Frank E. Bell for a bonus payment of $2.50 per acre payable on the successful conclusion of an action to be brought against the defendant canceling his oil and gas lease and that Bell agreed to pay the cost of bringing the action. Oil was discovered in North Dakota on April 5, 1951. It is argued that these facts establish a motive for bringing the action and have a decisive bearing upon the question of delay and the failure of the plaintiffs to rescind more promptly. This evidence has no bearing upon the fraud perpetrated by Naddy which was clearly established. Although the action may have been brought pursuant to a champertous agreement with Bell that fact, if established, cannot be taken advantage of by Naddy, a third person, as a defense against fraud on his part. 10 Am.Jur., Champerty and Maintenance, Section 29; 14 C.J.S. Champerty and Maintenance § 58. Under the circumstances in this case the justification for delay in bringing the action is not destroyed by the fact that it may have been brought pursuant to a champertous agreement. Nor is the time that elapsed between the discovery of the fraud and the commencement of the action rendered unreasonable because the plaintiffs may have been encouraged and assisted by one not a party to the lease.

The judgment appealed from is affirmed.

GRIMSON, C. J., and SATHRE and BURKE, JJ., concur.

JOHNSON, J., deeming himself disqualified did not participate; LUNDBERG, District Judge, sitting in his stead.

LUNDBERG, District Judge (dissenting).

It is with some reluctance that I feel compelled to dissent from and disagree with the result arrived at by the Court majority and with some of the views expressed in the majority opinion. First, I find myself unable to agree that the evidence shows that the defendant's fraud—whatever it was—*goes to the inducement.* Rather, I think the evidence shows that *after* the plaintiffs had executed the instrument involved and left some blank spaces to be filled in by the defendant, the defendant then filled in certain provisions other than those which had been verbally discussed by the parties. It appears to me that the authorities hold that certain legal and equitable consequences follow. See 76 C.J.S. Reformation of Instruments § 29, p. 369 and also 53 C.J. 949, note 63, citing Johnson v. Casserly, 37 N.D. 33, 163 N.W. 539 and M. Sigbert Awes Co. v. Haslam, 37 N.D. 122, 163 N.W. 265. The rule set forth holds that if the fraud is in the inducement, then cancellation may be asked for, but if the fraud is not in the inducement or occurs subsequently, then only reformation may be had. Apparently the underlying theory is that if the fraud was in the inducement then there was no real contract entered into and the Court cannot make something that the parties had not made. But, if the fraud is in matters other than the inducement, then the parties *did agree* upon a contract and if the instrument signed did not express that agreement, either by reason or mistake or fraud, the remedy is to reform it.

However, there is another matter more fundamental where I find myself in disagreement which relates to facts appearing in the record even though not pleaded by the parties. The record shows that the lease was made on April 21, 1950, and the action to set it aside was commenced by a complaint dated November 19, 1951—about nineteen months after the lease had been entered into and about seven months after oil had been discovered in Tioga on April 5, 1951. The lease was recorded on April 28, 1951, nearly seven months before the action was brought. The record further shows that the plaintiffs took no action regarding the alleged fraud of the defendant until they were approached by one Frank Bell and one R. E. Smith in the late fall of 1951, who proposed to take another oil lease on the same lands which had been leased to the defendant. The record then shows, and the plaintiff admits, that he entered into an agreement with these gentlemen under which they were to undertake all the expense and responsibility of breaking defendant's lease in order that the lease plaintiff gave to them would then be effective. Drafts for several hundred dollars were given by Smith and Bell to the plaintiffs, payable five days after the final judgment of the Court should have held defendant's lease invalid. The selection of the lawyers and payment of all expenses of litigation were to be made by Smith and Bell. Accordingly, the plaintiffs were coming before the Court as puppets of Smith and Bell.

This state of affairs is recognized in the majority opinion near its conclusion but the matter is dismissed as something that the defendant cannot raise, he being a third party to the obviously champertous agreement made between the plaintiffs and Smith and Bell. I recognize there is such a rule under the authorities cited. This rule however, is subject to another and more fundamental rule that a court of equity, upon its own motion or "sua sponte", will take cognizance of matters necessary to protect its own integrity and to prevent it from being used in the attainment of illegal or inequitable objectives. See 30 C.J.S. Equity §§ 97, 99, pp. 487, 498–499 and also note 44 on illegality and note 45 on violations of public policy. In application of these doctrines courts of equity have not limited themselves to matters directly involved in the case before it but have gone into matters related to its history and thus connected with it, which is certainly true here. Even *disconnected* conduct on the part of

those seeking affirmative relief has been considered under the maxim of "clean hands." 21 C.J. 185–186. Courts of equity have always avoided giving effect to unlawful contracts or matters contrary to public policy even remotely related to the matter in hand. Pomeroy's Equity Jurisp. Section 1276.

However, I do not urge that the rules just referred to should be so applied as to deny to the plaintiffs *all relief*. On the contrary, I believe that the rules should only be applied insofar as is necessary to effectuate their purpose. In other words, the plaintiffs should be denied that portion of their relief which is tainted with their agreements with Smith and Bell. This can be done by granting them reformation but denying them cancellation and requiring them to do equity by being bound by the contract which they admit they made with the defendant and which they declare they would have been satisfied with had he only inserted the conditions which had been discussed between them. While I look with suspicion on much of plaintiffs' evidence because of their interest, under the agreement with Smith and Bell for breaking the lease, I recognize that the trial judge, who heard and saw the witnesses, is in the best position to evaluate their testimony and he found that certain provisions, other than those agreed upon, had been inserted in the lease after its execution.

I feel that the plaintiffs are entitled to such relief, in spite of their delay in taking action and in spite of the change of circumstances that have taken place between the time that the lease was made and the action was commenced. To say that this delay was justified by the fact that the defendant had left the State, appears to me to completely ignore the provisions of Section 28–0620, NDRC 1943, for the service of summons by publication. Under existing law the defendant could have been placed in default after forty-five days from the date of the first publication of the summons in an action brought against him. And the provisions of Ch. 32–17, NDRC 1943, would have provided an ample remedy— even if plaintiffs had forgotten defendant's name and if they were without a copy of the lease they had signed without first reading it. However, if reformation is the remedy granted, the defendant is not prejudiced by plaintiffs' laches.

Much might be said regarding the "public policy" effects of a decision that appears to point to easy ways of circumventing the statutory prohibitions against barratry, champerty and maintenance in Ch. 12–17, NDRC 1943. With every indication that our oil development is growing it would seem that operations, such as those of Smith and Bell as disclosed in this case, should be discouraged if the courts are not to be flooded with litigation so engendered.

For the reasons and upon the grounds here stated, I am of the opinion that the judgment appealed from should be modified by returning the same to the District Court for reformation in accordance with the facts found to exist and that as so reformed the lease should be held valid.